UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| SUSAN BRADFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:05-CV-240 |
| | ) | (VARLAN/GUYTON) |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Susan Bradford filed this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, to recover long-term disability benefits from Metropolitan Life Insurance Company ("MetLife"). The case is before the Court on the plaintiff's Motion for Judgment on the Pleadings [Doc. 33] and the defendant's Motion for Judgment on the Pleadings [Doc. 38]. The plaintiff urges the Court to find that defendant erred in denying her long term disability ("LTD") benefits and to reverse the defendant's administrative decision to that effect. The defendant argues that its decision to deny plaintiff LTD benefits is supported by the administrative record and should be affirmed. The Court has carefully considered the parties' briefs [Docs. 34, 39, 41, 42, 43, 44] and the entire Administrative Record.[1]

---

[1]The Administrative Record ("AR") filed with the Court consists of 350 pages, not counting the actual disability plan which is paginated separately, and will be cited as "AR at ___."

For the reasons set forth herein, the Court will grant plaintiff's motion for judgment on the pleadings and deny defendant's motion for judgment on the pleadings.

## I.  Relevant Facts

## A.  Claim History

Plaintiff Susan Bradford ("Plaintiff") was previously employed as a Senior Auditor for Bechtel Jacobs LLC ("Bechtel").  Plaintiff was eligible for benefits under Bechtel's Long Term Disability Plan (hereinafter the "Plan").[2]  The Plan is funded through a MetLife insurance policy, and MetLife also administers the Plan.

The Plan provides LTD benefits for a period of disability "due to sickness, pregnancy, or accidental injury."  (SPD at 0009).  In order to be considered disabled under the Plan, a claimant must show that she is "receiving Appropriate Care and Treatment from a Doctor on a continuing basis" for a sickness, pregnancy, or accidental injury and:

> 1. During the first 24 months, including your Elimination Period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy; or
>
> 2. After the first 24 month period, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings.
>
> Your loss of earnings must be a direct result of your sickness, pregnancy or accidental injury.  Economic factors such as, but

---

[2] The Plan, consisting of 73 pages, was filed with the Administrative Record, but is paginated separately.  The Plan will be cited as "SPD at ___."

not limited to, recession, job obsolescence, paycuts and job-sharing will not be considered in determining whether you meet the loss of earnings test.

(*Id*.).  Appropriate Care and Treatment is defined as "medical care and treatment that meet all of the following:"

> 1. it is received from a Doctor whose medical training and clinical experience are suitable for treating your Disability;
>
> 2. it is necessary to meet your basic health needs and is of demonstrable medical value;
>
> 3. it is consistent in type, frequency, and duration of treatment with relevant guidelines of national medical, research and health care coverage organizations and governmental agencies.

(*Id*.).  The Plan also requires a claimant to "provide documented proof of [the claimant's] disability."  (SPD at 0019). The Plan indicates that "[p]roof includes, but is not limited to: the date [the claimant's] Disability started; the cause of [the claimant's] Disability; and the prognosis of [the claimant's] Disability.  (*Id*.)

Plaintiff ceased work on August 19, 2002, and filed an application for short term disability benefits.[3]  (AR at 0256-57).  Plaintiff was granted the maximum period of short term disability benefits, payable from August 20, 2002 through February 22, 2003.  (AR at 0001-0005).  On December 15, 2002, Plaintiff applied for LTD benefits, alleging disability because of "chronic pain, confusion, lack of short term memory, inability to follow directions, [and] falling asleep without warning."  (AR at 0256).  In connection with

---

[3]Plaintiff's application for short term disability does not appear to be part of the Administrative Record.

Plaintiff's application for LTD benefits, one of Plaintiff's treating physicians, Dr. Antonio Ramos, submitted an Attending Physician Statement diagnosing Plaintiff with fibromyalgia, chronic back pain, and severe depression. (AR at 0236-40). Dr. Ramos opined that Plaintiff could only work a total of two hours per day and would be unable to return to work indefinitely because of the sedating effect of Plaintiff's medications and because of her physical ailments. (*Id*.).

On February 10, 2003, MetLife issued its first denial of Plaintiff's application for LTD benefits. In explaining the rationale behind the denial, MetLife indicated that "we have determined that there is insufficient objective evidence documented to support the existence of a totally disabling condition preventing you from performing your own occupation. . . . For further review we would need objective documentation such as diagnostic testing such as MRI, X-rays and/or EMG." (AR at 0130-31).

In response to the denial, Plaintiff retained counsel and submitted additional information, but was again denied on April 9, 2003, because of lack of objective evidence of disability. (AR at 0121-23). In support of its second denial, MetLife relied on the opinion of Dr. Tracey Schmidt, an independent physician consultant, board certified in internal medicine and rheumatology, who was hired to perform a review of Plaintiff's file. (AR at 0125-28). Dr. Schmidt opined that the "[f]ile lacks objective evidence of a physical functional capacity impairment to a full time sedentary position with ability to stretch and change positions." (AR at 0127). With regard to Plaintiff's mental ailments, Dr. Schmidt indicated that "[f]ile mentions several mental nervous diagnoses, along with stress due to

poor health of husband but I am not qualified to comment on this." (AR at 0127-28). Dr. Schmidt further opined that the "mainstream treatment for fibromyalgia is low dose antidepressants and exercise. Narcotics are not considered mainstream treatment for fibromyalgia. . . . The literature has shown that fibromyalgia patients do better if they continue to work and exercise." (AR at 0128).

On October 26, 2003, Plaintiff appealed MetLife's denial of LTD benefits and submitted additional information concerning her claim. (AR at 0200-01). On November 24, 2003, MetLife issued its third denial of LTD benefits, again finding that "there is insufficient information to support an impairment." (AR at 0112-15). The November denial relied on the opinion of Dr. Robert C. Porter, an independent physician consultant, board certified in occupational medicine, who was hired to perform a review of Plaintiff's file. (AR at 0117-19). In his report, Dr. Porter opined that the evidence contained in Plaintiff's file

> does not support a condition that would remove the ability of [Plaintiff] from performing sedentary work activities beyond 2/10/03. She has pain complaints that are out of proportion to her pathology and she does not appear to even qualify for the diagnosis of fibromyalgia. If she does qualify for the diagnosis of fibromyalgia, the condition does not appear to be of an extent that would remove the ability to perform sedentary to light work activities. It is well known that individuals with fibromyalgia routinely perform sedentary to light work duties that are not highly repetitive assembly line type work in nature.

(AR at 0118). In response to Plaintiff's complaints of drowsiness and cognitive dysfunction, Dr. Porter opined that "[Plaintiff] does not have a condition that would benefit from ongoing narcotic medications. The medication should be reduced and if there is cognitive

dysfunction, this would be remedied by the reduction in narcotic medications." (*Id.*). Dr. Porter did not address Plaintiff's diagnosis of depression. (AR at 0117-19). Additionally, the November denial indicated that Plaintiff had exhausted her administrative remedies and that no further appeals would be considered. (AR at 0115).

In response to the November denial, Plaintiff retained new counsel and submitted additional information concerning her claim. (AR at 0013-11, 0132-60). In response, MetLife issued a letter, dated November 4, 2004, stating that the November 24, 2003, decision was the final decision on review and that the additional information submitted "does not change our decision." (AR at 0012). In response, Plaintiff filed the instant action. [Doc. 1].

**B.    Plaintiff's Relevant Medical History**

**1.    Dr. Antonio Ramos**

Dr. Antonio Ramos, Plaintiff's internal medicine doctor, submitted a number of medical records covering his treatment of the ailments supporting Plaintiff's disability claim. On May 24, 2002, Dr. Ramos saw Plaintiff for chronic back and neck pain, as well as allergic rhinitis. (AR at 0299). Dr. Ramos also indicated that Plaintiff was not sleeping well at night, was suffering from hypersomnia during the day, and was taking several different pain medications, which might be causing some sedation. (*Id.*). Plaintiff was diagnosed with chronic back and neck pain, HTN, and allergic rhinitis. (*Id.*). Dr. Ramos prescribed water physical therapy and a reduction in pain medication. (*Id.*).

On August 16, 2002, Dr. Ramos again saw Plaintiff concerning her chronic pain. (AR at 0294). Dr. Ramos's physical examination found "[d]ifferent tender spots throughout the back, upper and lower, hips, knees, shoulders," and he diagnosed Plaintiff with chronic myalgias, athralgias, deteriorating weakness of back and leg muscles, severe depression, and possible fibromyalgia. (*Id.*). Plaintiff was referred to Dr. Sizemore and Dr. Burns for rheumatologic evaluation. (*Id.*).

On September 12, 2002, Dr. Ramos saw Plaintiff for her continuing back pain. (AR at 0292). Dr. Ramos's exam indicated that Plaintiff had multiple tender spots throughout the joints and back with decreased range of motion. (*Id.*). Dr. Ramos noted that Plaintiff had scheduled appointments with Dr. Glass, a physiatrist, and Dr. Sizemore, a rheumatologist. (*Id.*).

On October 17, 2002, Dr. Ramos opined that Plaintiff "has diagnosis of fibromyalgia, chronic pain syndrom in the back, severe depression followed by psychiatry." (AR at 0290). Dr. Ramos wrote that Plaintiff's medications could be causing her daytime drowsiness, but he also indicated that Plaintiff needed the medications because of her symptoms. (*Id.*). A physical exam revealed that "the neck has no jugular vein distention, decreased range of motion with tenderness along the cervical spine. There are trigger points throughout the thoracic lumbosacral spine as well and the hips." (*Id.*). Dr. Ramos was also concerned about the possibility of sleep apnea and suggested a sleep study. (*Id.*). An addendum to the October 17, 2002, medical record states that "overall prognosis is poor. It does not seem [Plaintiff will] be able to work in the near future [with the] above problems." (*Id.*).

In a letter dated December 5, 2002, Dr. Ramos opined that Plaintiff suffers from fibromyalgia with associated chronic pain and depression due to her pain and inability to do her work. (AR at 0280). Dr. Ramos indicated that Plaintiff's medications, required for her physical ailments as well as her depression, made it very difficult for Plaintiff to concentrate, perform simple tasks, stay awake, and also affected her short-term memory. (*Id.*). Dr. Ramos further opined that Plaintiff could not sit or stand for more than thirty minutes without needing to lie down, that she required the use of a cane for walking, and that she continued to suffer from panic attacks.

On December 30, 2002, Dr. Ramos saw Plaintiff for her continuing pain. (AR at 0232). Dr. Ramos advised Plaintiff that they would need to cut down on her pain medications, as "high doses will not offer any more decreased pain than the lower doses." (*Id.*). Dr. Ramos opined that Plaintiff's "significant psych meds and pain meds . . . cause a lot of daytime somnolence and concentration problems." (*Id.*). Dr. Ramos diagnosed Plaintiff with "chronic fibromyalgia with significant MSK symptoms" and found that Plaintiff had "multiple trigger points along her neck, back and lower back which are chronic." (*Id.*).

In a letter dated February 14, 2003, Dr. Ramos stated that Plaintiff "had an MRI of her back which showed some degenerative disease but no herniated disc." (AR at 0222). Dr. Ramos also set forth that Plaintiff "had a DEXA scan that shows significant osteopenia which is currently being treated and also has had a sleep study that shows abnormal sleep patterns consistent with fibromyalgia." (*Id.*). Dr. Ramos stated that there is no definitive,

objective test for fibromyalgia, but that Plaintiff did fit the criteria for fibromyalgia. (*Id*.). Dr. Ramos attached copies of the MRI, DEXA scan, and sleep study to his letter. (AR at 0221, 0223, 0227-29)

### 2. Dr. Sizemore

Plaintiff also saw Dr. Kenny Sizemore, a rheumatologist. On October 23, 2002, Dr. Sizemore saw Plaintiff at the request of Dr. Ramos concerning Plaintiff's possible fibromyalgia. (AR at 0272).[4] Dr. Sizemore's exam of Plaintiff revealed tender points in the following regions: suboccipital, anterior cervical, mid-trapezius, medial scapular regions, posterior illiac, trochanteric bursa regions, and the medial epicondyles of both knees. (AR at 270, 273). Dr. Sizemore opined that Plaintiff had "typical physical exam findings of myofascial pain syndrome which has been termed fibromyalgia." (AR at 0273). Dr. Sizemore diagnosed Plaintiff with fibromyalgia, depression, chronic back pain, mild osteoarthritis, and degenerative disc disease of the lumbar spine. (AR at 0275).

### 3. Dr. Glass

Plaintiff also saw Dr. Sharon Glass, a physiatrist. On November 11, 2002, Dr. Glass submitted a "MetLife Fibromyalgia Initial Functional Assessment Form" on Plaintiff's behalf. (*Id*. at 0258-61). The form includes what appears to be a diagram depicting Plaintiff's various fibromyalgia tender points. (AR at 0259). The form also indicates that

---

[4]The Administrative Record is somewhat disjointed with respect to Dr. Sizemore's report. A complete copy of the first page of the report is located at AR 0272. A complete copy of page two of the report is located at AR 0270. A complete copy of page three is located at AR 0273. A complete copy of the fourth and final page is located at AR 0271. There are additional, partial copies of the report scattered throughout the record, but those copies appear to be redundant.

Plaintiff has severe problems with muscular pain, neck pain, fatigue, energy loss, pain on bending and palpation, depression, concentration, and panic attacks. (*Id.*). Dr. Glass opined that Plaintiff had severe symptoms, was showing poor progress, and that Plaintiff's depression would need to be addressed before Plaintiff could return to work. (AR at 0260). Finally, Dr. Glass indicated that the primary condition she was treating Plaintiff for was fibromyalgia and that all of the criteria for fibromyalgia had been met. (AR at 0261). The record appears to contain further treatment notes from Dr. Glass, but they are handwritten and, for the most part, illegible. (*See* AR at 0212-17, 0283, 0286).

### 4. Dr. Montgomery

Plaintiff also saw Dr. James Montgomery, a clinical psychologist. Dr. Montgomery submitted a letter to MetLife, dated December 5, 2002, on Plaintiff's behalf. (AR at 0265-66). In that letter, Dr. Montgomery stated that he had been treating Plaintiff for depression and anxiety since November 19, 2001. (AR at 0265). Dr. Montogmery opined that he had seen a slight improvement in Plaintiff when her husband's health improved, but that Plaintiff's depression and anxiety still remained at "clinically troublesome levels." (AR at 0266). Dr. Montgomery further opined that Plaintiff was "fragile and unable to tolerate or manage much stress (as might be expected were she to return to work). Given her extreme difficulty in concentrating and focusing it would seem impossible for [Plaintiff] to function at her job, especially given the nature of her work." (*Id.*).

### 5. Dr. Hogan

Plaintiff also saw Dr. William Hogan, a psychiatrist. On September 4, 2002, Dr. Hogan provided MetLife with an assessment indicating that Plaintiff suffered from major depression, which was exacerbated by her husband's poor health. (AR at 0311-15). Dr. Hogan opined that Plaintiff had a GAF of 60[5] and was receiving various medications for her depression. (AR at 0312). Dr. Hogan also claimed that Plaintiff was having a "good response" to the current treatment. (*Id*.).

On December 12, 2002, Dr. Hogan wrote that Plaintiff "is my patient and is disabled by her pain, her panic attacks and anxiety, as well as her depression. Due to these illnesses, she cannot focus or concentrate to complete tasks requiring those skills." (AR at 0279). Dr. Hogan also indicated that the effects of Plaintiff's pain medication had an additional impact on her condition. (*Id*.).

### 6. Dr. Kabbani

Plaintiff also saw Dr. Sam Kabbani, a neurologist. In two letters, dated July 24, 2003, and September 24, 2003, Dr. Kabbani diagnosed Plaintiff with degenerative disc disease, degenerative joint disease, osteoarthritis, and spondylosis, all evidenced by MRI testing. (AR 0162-71). Dr. Kabbani also diagnosed Plaintiff with peripheral polyneuropathy, as

---

[5]A GAF of 60 is indicative of "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).

evidenced by PNCV and EMG testing, and sleep apnea, excessive daytime drowsiness, and restless legs syndrome, as evidenced by two sleep studies. (AR 0162).

## II.    Standard of Review

This action seeking a review of the denial of Plaintiff's benefits is governed by ERISA, 29 U.S.C. § 1132(a)(1)(B), which provides as follows:

> A civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to further benefits under the terms of the plan.

In *Wilkins v. Baptist Healthcare Systems*, 150 F.3d 609, 617-20 (6th Cir. 1998), the Sixth Circuit established guidelines under which district courts must adjudicate ERISA cases brought before them for judicial review. The Sixth Circuit explained that using summary judgment as a tool for the adjudication of ERISA cases does not properly comport with the purpose of summary judgment. *Id*. at 619. Because the role of a district court in ERISA matters is not to determine whether issues of fact exist for trial, but to review the administrative record before it, district courts should more properly characterize their role in such proceedings as encompassing elements of both bench trials and summary judgments. *Id*. at 619-20. Following these guidelines, the district court proceeds by making adjudications on both fact and law as would occur in a bench trial while handling the matter in an expedited fashion resembling summary judgment. *Id*.

Furthermore, *Wilkins*, following Supreme Court precedent, dictates this Court's standard of review in ERISA matters. Under *Wilkins*, this Court has two possible standards

of review.  If the trustees of an employee benefits plan do not have discretion to determine eligibility for benefits or to construe the terms of the Plan, this Court is required to undertake a *de novo* review of the administrators' decision.  *Id*. at 613.  On the other hand, where a benefits plan vests discretion with the administrators, this Court may only disturb the administrators' decision if it finds the basis of such a decision to be arbitrary and capricious. *Id*. at 616 (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Significantly, regardless of the standard of review applied to the administrators' decision, "in an ERISA claim contesting a denial of benefits, the district court is strictly limited to a consideration of the information actually considered by the administrator."  *Killian v. Healthsource Provident Admin., Inc.*, 152 F.3d 514, 522 (6th Cir. 1998) (citing *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990)).

In this case, the Plan states as follows:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan.  Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(SPD at 0028).  Both parties agree that the Plan grants discretion to MetLife as a claims administrator.  Accordingly, the arbitrary and capricious standard of review applies.

"The arbitrary and capricious standard is the least demanding form of judicial review of administrative action." *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 292 (6th Cir. 2005)

13

(quoting *McDonald v. Western Southern Life Ins.*, 347 F.3d 161, 169 (6th Cir. 2003)). "When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was rational in light of the plan's provisions. Stated differently, when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *McDonald*, 347 F.3d at 169 (quoting *Williams v. International Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)). An administrator's decision will be upheld "'if it is the result of a deliberate reasoned process and if it is supported by substantial evidence.'" *Evans v. Unumprovident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (quoting *Baker v. United Mine Workers of America Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)).

Yet, the arbitrary and capricious standard does not make courts "rubber stamps for any plan administrator's decision as long as the plan was able to find a single piece of evidence-no matter how obscure or untrustworthy-to support a denial of a claim for ERISA benefits." *McDonald*, 347 F.3d at 172. The Court is obligated to make a review of both the quality and the quantity of the medical evidence and the opinions on both sides of the issues. *Id.* "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir.2002).

Thus, the issue before the Court is whether the decision of MetLife to deny Plaintiff LTD benefits constitutes an arbitrary and capricious act based upon the administrative record.

"When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Spangler*, 313 F.3d at 361 (internal quotations and citations omitted).

## III.  Analysis

Plaintiff has presented several arguments in support of his position that MetLife's decision to deny her LTD benefits was arbitrary and capricious.  First, plaintiff argues that, based upon the assessments of all of Plaintiff's treating physicians, Plaintiff is clearly disabled under the plan.  Second, Plaintiff contends that MetLife's reliance upon non-examining, file-reviewing medical consultants was arbitrary and capricious, especially in light of the alleged conflicts of interest both MetLife and the file-reviewing consultants faced.  Third, Plaintiff contends that MetLife did not properly take into account all aspects of Plaintiff's medical condition.  Fourth, Plaintiff argues that MetLife's decision to deny LTD benefits was arbitrary in light of its decision to grant STD benefits, when there was no evidence of medical improvement.  Finally, Plaintiff argues that the Court should consider all of the documents submitted to MetLife, including those documents submitted after the November 24, 2003, decision to deny LTD benefits.

MetLife argues that the decision to deny Plaintiff's claim for LTD benefits was not arbitrary or capricious because the decision is supported by substantial evidence.  MetLife contends that the lack of objective evidence of disability supports MetLife's decision to deny LTD benefits.  MetLife also contends that Plaintiff received a full an fair review of her claim,

and that MetLife was not required to consider evidence submitted after Plaintiff had exhausted her administrative remedies.

Thus, it appears that there are three issues to be resolved: (1) whether MetLife's refusal to consider additional medical evidence submitted after Plaintiff had exhausted her administrative remedies was arbitrary and capricious; (2) whether the decisions of MetLife or its consulting physicians were swayed by a conflict of interest; and (3) whether MetLife's determination that plaintiff is not disabled was arbitrary and capricious.

## A.    Consideration of Additional Medical Evidence

MetLife contends that it granted Plaintiff a full and fair review of her claim. MetLife further contends that once Plaintiff had exhausted her administrative remedies, it was not required to grant Plaintiff additional appeals just because she retained new counsel. Plaintiff argues that it was improper for MetLife to refuse to review the additional evidence submitted by Plaintiff.

Plaintiff's application for LTD benefits was initially denied on February 10, 2003. (AR at 0130-31). Plaintiff had 180 days to appeal that decision (AR at 0131), and Plaintiff did so by submitting additional medical evidence. Plaintiff was again denied LTD benefits on April 9, 2003. (AR at 0121-23). Plaintiff was again given 180 days to appeal the decision, which she did. (AR at 0122). Plaintiff's third denial occurred on November 24, 2003. (AR at 0112-15). The third denial indicated that Plaintiff had exhausted her administrative remedies and that no further appeals would be considered. (AR at 0115). After the third denial, plaintiff retained new counsel and submitted additional medical

evidence.  (*See* AR 0013-111, 0132-60).  On November 4, 2004, MetLife indicated that it had issued its final decision in November, 2003, and that Plaintiff had received a full and fair review.  (AR at 0012).  MetLife went on to state that "[t]he additional medical information you have submitted does not change our decision."  (*Id.*).

The federal regulations require only a 180 day period for the appeal of adverse disability benefit determinations.  29 C.F.R. § 503-1(h)(4).  Plaintiff was given 180 days in which to appeal, and therefore it was not arbitrary and capricious for MetLife to refuse to consider evidence submitted after Plaintiff's appeal period had run.  Plaintiff contends that MetLife did consider that information, based upon its indication that the additional information provided did not affect its decision.  However, given that MetLife stated that the November 24, 2003, decision was its final decision, and given that there is no evidence that MetLife considered the additional information submitted after November 24, 2003, nor that it hired another consulting physician to review the additional information, the Court finds that MetLife did not consider the additional information submitted by Plaintiff after MetLife's final decision.

Additionally, the Sixth Circuit has held that "[t]here can be no dispute that in this circuit, in an ERISA claim contesting a denial of benefits, the district court is strictly limited to a consideration of the information actually considered by the administrator."  *Killian v. Healthsource Provident Administrators, Inc.*, 152 F.3d 514, 522 (6th Cir. 1998).  Accordingly, the Court cannot consider the information Plaintiff submitted after MetLife had

reached its final decision, specifically pages 0013 through 0111 and 0132 through 0160 of the Administrative Record.

**B.    Conflict of Interest**

Plaintiff contends that the decisions of both MetLife and the doctors MetLife hired to review Plaintiff's case file were affected by a conflict of interest. Specifically, Plaintiff contends that MetLife faces a conflict because it both decides whether a claimant is eligible for benefits and, if eligible, pays the benefits. Plaintiff further contends that the doctors hired by MetLife face a conflict because a decision adverse to MetLife might deter MetLife from retaining the doctor's services in the future. MetLife contends that there is no proof of any conflict for either Metlife or the doctors retained by MetLife.

The Sixth Circuit has held that "a conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits." *Evans*, 434 F.3d at 876. However, that finding "does not displace the arbitrary and capricious standard of review; rather, it is a factor that [the Court] consider[s] when determining whether the administrator's decision to deny benefits was arbitrary and capricious." *Id*. "In considering such a conflict, there must be significant evidence in the record that the insurer was motivated by self-interest, and the plaintiff bears the burden to show that a significant conflict was present." *Smith v. Continental Casualty Co.*, 450 F.3d 253, 260 (6th Cir. 2006).

It is true that MetLife, as both the decision maker and the payer of claims, faces a potential conflict of interest when determining whether to grant a disability claim. However, there is simply no evidence in the record that MetLife's decision to deny benefits was

motivated by self-interest. Similarly, the doctors retained by MetLife may face a similar conflict, but there is no evidence that the decisions of the doctors were affected by a fear of losing future consulting contracts with MetLife. The mere possibility of a conflict of interest is not enough to show bias, therefore the Court finds that the decisions of neither MetLife, nor the doctors retained by MetLife, were improperly affected by a conflict of interest.

### C.  Whether Plaintiff Is Disabled

The third issue the Court must resolve is whether MetLife's determination that Plaintiff is not disabled was arbitrary and capricious. Plaintiff argues that the record clearly shows that Plaintiff is disabled, and that MetLife decision to deny LTD benefits was arbitrary and capricious. MetLife contends that its decision to deny benefits is supported by substantial evidence.

MetLife's first denial of LTD benefits indicated that there was insufficient objective evidence to support a finding of total disability. (AR at 0131). MetLife's second denial, based upon Dr. Schmidt's review of Plaintiff's file, again indicated that there was a lack of objective evidence sufficient to support a finding of disability. (AR at 0122). MetLife's third denial, based upon Dr. Porter's review of Plaintiff's file, indicated that there was "insufficient information to support an impairment that would prevent [Plaintiff] from engaging in her own occupation." (AR at 0114). Additionally, MetLife indicated that Dr. Porter found that Plaintiff's "pain complaints were out of proportion to her pathology or diagnosis and the information did not support a condition that would produce disabling pain and prevent her from performing her job duties." (*Id*.). Therefore, all of MetLife's denials

were based on a lack of objective evidence of disability. Furthermore, MetLife relied on the opinions of Dr. Schmidt and Dr. Porter, based upon a review of Plaintiff's file, over the opinions of Plaintiff's treating physicians; nor did MetLife exercise its option under the Plan[6] to have Plaintiff physically examined by a doctor of MetLife's choice.

In describing the disease of fibromyalgia, also known as fibrositis, the Sixth Circuit has held that

> fibrositis causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances. In stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. **There are no objective tests which can conclusively confirm the disease**: rather it is a process of diagnosis by exclusion and testing of certain "focal tender points" on the body for acute tenderness which is characteristic in fibrositis patients. The medical literature also indicates fibrositis patients may also have psychological disorders. The disease commonly strikes between the ages of 35 and 60 and affects women nine times more than men.

*Preston v. Sec'y of Health and Human Servs.*, 854 F.2d 815, 817-18 (6th Cir. 1988) (per curiam) (emphasis added). Additionally, the *Preston* court noted that "fibrositis patients . . . can not sit, stand, or maintain any one position for any length of time." *Id*. at 818. The *Preston* court held that persuasive evidence of disabling fibromyalgia included the "systematic elimination of other diagnosis, identification of focal tender points and

---

[6]Under the Plan, MetLife has the right to have a claimant examined by medical specialists of MetLife's choice. Failure to cooperate with such a request would result in denial of benefits. (SPD at 0018).

observation of other classic symptoms of fibrositis." *Id*. at 820. The Seventh Circuit has held that eleven trigger points are required for a showing of fibromyalgia, but the Sixth Circuit has not cited any number. *See Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996) ("the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia.").

With regard to the issue of the opinion of a file reviewing doctor, the Sixth Circuit has held that "the failure to conduct a physical examination – especially where the right to do so is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert*, 409 F.3d at 289. Additionally, a decision not to exercise the option to have an independent examination is placed under heightened scrutiny when a file reviewing physician makes credibility determinations about a claimant's subjective complaints. See *Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2006) ("we consider [the plan administrator's] decision to not require an examination as part of the arbitrary and capricious review, especially because [the file reviewing doctor] made credibility determinations concerning [plaintiff's] subjective complaints. [The plan administrator] could have obtained an independent medical examination to evaluate [plaintiff's] pain. Their decision to not perform this examination supports the finding that their determination was arbitrary.). The *Smith* court also indicated that an administrator's failure to take into account the effects a claimant's medication had on the claimant's ability to work is another factor that should be considered when making the arbitrary and capricious analysis. *Id*. at 265.

Finally, although a plan administrator is not required to give special deference to plaintiff's treating physicians, nor may an administrator arbitrarily rely on one of its own consultants in the face of all other contrary evidence. *See Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002) (insurance company acted arbitrarily in relying on one report from physician instead of entire file); *Williams v. International Paper Co.*, 227 F.3d 706, 713 (6th Cir. 2000) (administrator's decision not to consider all of the medical evidence was arbitrary and capricious).

As noted above, MetLife had the option to conduct its own independent medical examination of Plaintiff, but chose not to do so. Rather, it relied on the opinions of Dr. Schmidt and Dr. Porter, who based their opinions upon a review of Plaintiff's file, which is a factor which supports a finding of arbitrary and capricious. Dr. Porter specifically found that Plaintiff's "pain complaints . . . are out of proportion to her pathology." (AR at 0118). Thus, Dr. Porter made a credibility determination concerning Plaintiff's subjective complaints, which is another factor which supports a finding of an arbitrary and capricious decision.

Additionally, Dr. Schmidt clearly indicated in her report that she was "not qualified" to discuss Plaintiff's "several mental nervous diagnoses." (AR at 0127-28). Dr. Porter opined that Plaintiff's mental dysfunction most likely resulted from Plaintiff's medications, but did not comment on Plaintiff's depression. (AR at 00117-19). Therefore, it appears that MetLife has completely disregarded Plaintiff's diagnosis of severe depression, which is another factor which supports a finding of arbitrary and capricious. Furthermore, Dr. Porter

clearly recognized that Plaintiff's pain medication had an effect of her ability to work, but he chose to discredit her allegations of pain and to ignore the decisions of Plaintiff's other treating doctors to prescribe the various medications, instead stating that Plaintiff should be weaned from her various pain medications. (AR at 0118). Thus Dr. Porter, and MetLife, chose to ignore the opinions of Plaintiff's treating physicians and also to ignore the effects Plaintiff's medications, including medications for both pain and for depression, had on her ability to work. The Court finds that this is another factor which supports a finding of arbitrary and capricious.

The Court notes that, in each of its denials, MetLife indicated that there was a lack of objective evidence to support a claim of disability. As noted above, the Sixth Circuit has held that there are no objective tests which can conclusively confirm the disease of fibromyalgia. *Preston*, 854 F.2d at 817-18. Rather, doctors must rely on a physical examination of the patient and a diagnosis of conclusion. *Id*. The record shows that Plaintiff's doctors found evidence of multiple trigger or tender points on Plaintiff, and the doctors agreed that Plaintiff has severe fibromyalgia. (AR at 232, 258-61, 270-73, 290). Given that Plaintiff's diagnosis of fibromyalgia meets the Sixth Circuit's standard and given that there are no objective tests which can confirm a finding of fibromyalgia, the Court finds that MetLife's requirement that Plaintiff provide further objective evidence to prove the existence of an illness which cannot be proven by objective medical testing is another factor which supports a finding of arbitrary and capricious.

Accordingly, in light of the Plaintiff's various diagnoses, including, but not limited to, fibromyalgia and depression, in light of the effect Plaintiff's various prescribed medications had on Plaintiff's ability to work, and in light of the entire record as a whole, the Court finds that Plaintiff is totally disabled as defined by the Plan and that MetLife's conclusion that Plaintiff is not disabled was arbitrary and capricious.

## IV.    Conclusion

For the reasons set forth above, Plaintiff's Motion for Judgment on the Pleadings [Doc. 33] will be granted and the defendant's Motion for Judgment on the Pleadings [Doc. 38] will be denied.  Additionally, the Court notes that Plaintiff has requested pre-judgment interest and attorney's fees.  Accordingly, the Court will direct the parties to file simultaneous briefs regarding whether an award of pre-judgment interest and attorneys fee's is appropriate in this case, including a discussion of how any such amounts should be calculated.

Order accordingly.


s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE